Brandon Linn **DUDLEY**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 09–00–481–CR.

Court of Appeals of Texas,
Beaumont.

Submitted July 30, 2001.

Decided Oct. 24, 2001.

David W. Barlow, Beaumont, for appellant.

Tom Maness, Criminal District Attorney, Philip Babin, Assistant Criminal District Attorney, Beaumont, for state.

Before WALKER, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

RONALD L. WALKER, Chief Justice.

Beaumont police found Brandon Linn Dudley sitting in a car in possession of a styrofoam cup. When police sniffed the contents of the cup the smell of cough syrup was present. Laboratory testing later confirmed the presence of codeine in the liquid mixture contained in the cup. Dudley was indicted for possession of codeine as listed under Penalty Group 1 in the Health and Safety Code, in an amount of "four hundred (400) grams and more." *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(a), (f) (Vernon Supp.2001). Prior to trial, the State moved to amend the indictment to charge Dudley with the entirely separate offense of possession of codeine as listed under Penalty Group 4 of the Health and Safety Code, in an amount of "four hundred (400) grams and more." *See* TEX. HEALTH & SAFETY CODE ANN. § 481.118(a), (e) (Vernon Supp.2001). However, the jury convicted Dudley of having committed the lesser included offense of possession of codeine as listed in Penalty Group 4, in an amount of "200 grams or more but less than 400 grams."

Dudley presents us with two appellate issues, the first of which complains of legally insufficient evidence contained in the record to support his conviction. Specifically, Dudley does not contest the sufficiency of the State's evidence regarding the *quantity* of the codeine found in the

liquid mixture contained in the styrofoam cup, but does contest the legal sufficiency of the State's proof regarding the *quality* of the codeine found in the liquid mixture, *as defined in Penalty Group 4.* In other words, as we appreciate Dudley's appellate complaint, the definition of "codeine" as set out in Penalty Group 4, as opposed to the definition of "codeine" as set out in any of the other penalty groups, IS the controlled substance the State alleged he unlawfully possessed. As such, the State was required to prove Dudley possessed codeine *as specifically defined* in Penalty Group 4, because each penalty group set out in the Health and Safety Code contain entirely distinct and separate lists of contraband, each with its own distinct chemical make-up. While two or more penalty groups may include the same generic controlled substance, distinctions arise, for penalty group purposes, when a controlled substance is defined in one penalty group in its "pure" form, while defined in other penalty groups based upon certain other distinct qualitative properties.

■ As does the Court of Criminal Appeals, this Court is bound to accept the legislative characterization or classification of prohibited substances regardless of how the scientific community view them. *See Few v. State,* 588 S.W.2d 578, 583 (Tex. Crim.App.1979). It has been observed that within the provisions of the Health and Safety Code, different controlled substances are deemed to constitute varying degrees of harm to society in their illicit uses, so differing punishments are authorized for the illicit use of the various controlled substances. *See Chalin v. State,* 645 S.W.2d 265, 272 (Tex.Crim.App.1982) ("When the Commissioner of Health classified phentermine by name within Schedule IV, phentermine was determined to be less harmful than the general class of isomers of methamphetamine listed in Schedule II.") In that light, the legislature apparently intended to place codeine into three of the four penalty groups based upon particular qualitative properties. Codeine's existence as a controlled substance is specifically defined in each penalty group in which it appears as follows:

Penalty Group 1:(2) the following opium derivatives, their salts, isomers, and salts of isomers, unless specifically excepted, if the existence of these salts, isomers, and salts of isomers is possible within the specific chemical designation: ... Codeine methylbromide; Codeine N Oxide; . . . .

(3) the following substances, however produced, except those narcotic drugs listed in another group: Codeine not listed in Penalty Group 3 or 4; . . . . [1]

Penalty Group 3:(4) a material, compound, mixture, or preparation containing limited quantities of the following narcotic drugs, or any of their salts: not more than 1.8 grams of codeine, or any if its salts, per 100 milliliters or not more than 90 milligrams per dosage unit, with an equal or greater quantity of an isoquinoline alkaloid of opium;

not more than 1.8 grams of codeine, or any of its salts, per 100 milliliters or not more than 90 milligrams per dosage unit, with one or more active, nonnarcotic ingredients in recognized therapeutic amounts; . . . . [2]

Penalty Group 4:(1) a compound, mixture, or preparation containing limited quantities of any of the following narcotic drugs that includes one or more nonnarcotic active medicinal ingredients in sufficient proportion to confer on the

---

1. TEX. HEALTH & SAFETY CODE ANN. § 481.102(2) & (3)(A) (Vernon Supp.2001).

2. TEX. HEALTH & SAFETY CODE ANN. § 481.104(a)(4) (Vernon Supp.2001).

compound, mixture, or preparation valuable medicinal qualities other than those possessed by the narcotic drug alone: not more than 200 milligrams of codeine per 100 milliliters or per 100 grams; . . . . [3]

We agree, therefore, with the portion of appellant's argument that, having pleaded possession of codeine "listed in Penalty Group 4 of the Texas Controlled Substances Act," the State was obligated to elicit evidence sufficient to prove Dudley's possession of codeine as specifically defined under section 481.105(1), which defines Penalty Group 4 "codeine" as, *inter alia,* a 200 milligram to 100 milliliter (or 100 gram) concentration ratio when mixed with the required "nonnarcotic active medicinal ingredients." The question then becomes whether the record reflects the State satisfied its burden to elicit legally sufficient evidence of the required Penalty Group 4 concentration amounts.

In support of his position on this issue, Dudley points out that the State's laboratory analyst, Charlyn Voight, testified that she did not specifically measure nor quantify the concentration of codeine contained in the liquid submitted by the police for laboratory analysis. However, we note the following testimony of Ms. Voight appears in the record:

Q.(State) Ms. Voight, did you conduct a chemical analysis of the contents-the liquid contents that was found in State's Exhibit Number 1, the styrofoam cup with the lid and the straw?

A.(Ms. Voight) Yes, I did.

Q. Okay. What were the results of that analysis?

A. That the liquid contained in the cup contained Codeine and one or more, in this case, one other active medicinal ingredient.

Q. And, what was that?

A. The other ingredient was Promethazine.

Q. Okay.

A. And this is a combination commonly found in cough syrup type preparations that contain Codeine in a concentration of less than 200 milligrams per 100 milliliters of syrup.

In addition to the above testimony, Dudley introduced into evidence as Defendant's Exhibit 1, the written laboratory report in which the identical evidence as to codeine concentration was set out. In reviewing a record for legally sufficient evidence to support the conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found all of the essential elements of the offense proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Santellan v. State,* 939 S.W.2d 155, 160 (Tex.Crim.App. 1997). In a legal sufficiency analysis, we consider all the evidence, whether properly or improperly admitted. *Bobo v. State,* 843 S.W.2d 572, 575–76 (Tex.Crim.App. 1992); *Chambers v. State,* 805 S.W.2d 459, 460 (Tex.Crim.App.1991). The record before us contains, as set out above, the testimony from Ms. Voight that the codeine Dudley possessed was combined with another active medicinal ingredient, promethazine. There was no objection to this testimony, nor to Ms. Voight's next response that indicated the codeine/promethazine mixture was a combination typically found in concentrations of 200 milligrams of codeine per 100 milliliters of syrup.[4] Additionally, Defendant's Exhibit

---

3. Tex. Health & Safety Code Ann. § 481.105(1) (Vernon Supp.2001).

4. The dissent addresses the issue of the lack of scientific reliability of Voight's testimony.

1, containing the same codeine concentration evidence, was also before the jury. This is legally sufficient evidence for proof of the codeine concentration as defined under Penalty Group 4 of the Health and Safety Code.

■ Finally, we take issue with the following statement contained in appellant's brief: "Without testimony regarding the concentration, any possible ratio of mixture could be inferred. To do so would not be to prove the codeine was listed in Penalty Group 4. It is also listed in Penalty Group 1 and Penalty Group 3." This seems to imply that, so long as the *weight* of the codeine is the same, proof of "concentration" alone was necessary in order to eliminate the possibility of appellant's guilt under either Penalty Group 1 or Penalty Group 3.[5]

This portion of Dudley's argument is misplaced because each penalty group defines the qualitative presence of "codeine" either by (1) no use of "concentration" whatsoever, or (2) by "concentration" in proportion to other substances that are explicitly *not* defined as "one or more non-narcotic active medicinal ingredients in sufficient proportion to confer on the compound, mixture, or preparation valuable medicinal qualities other than those possessed by the narcotic drug alone[.]" Indeed, in Penalty Groups 1, 3, and 4, the descriptive language of the particular controlled substance containing "codeine" contains distinctively different and concise wording. It is equally incorrect to say that a conviction for Penalty Group 4 "codeine," (with its specific requirement that the "compound, mixture, or preparation," be of such a quality that it possesses "medicinal qualities other than those possessed by the narcotic drug alone") could somehow include a conviction for Penalty Group 1 "codeine" ("Codeine methylbromide" or "Codeine N Oxide").[6] At any rate, we find the evidence legally sufficient with regard to the qualitative concentration of codeine in relation to the other active nonnarcotic

However, we note that neither the reliability of her testimony nor her qualifications as an expert are raised by any point of error in this appeal. While a brief must state all issues or points presented for review; the statement of the issue will be treated as covering every subsidiary question that is fairly included. *See* Tex.R.App. P. 38.1(e). "The brief must also contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex.R.App. P. 38.1(h). Here, there was no issue raised on appeal regarding the reliability of the testimony or Ms. Voight's qualifications. Consequently, we do not address them.

5. The concurrence takes the position that Dudley is essentially contending he is guilty of a greater offense than that for which he was convicted. As we explain above, because of his misplaced characterization of the penalty group distinctions of codeine as based solely on "concentration," Dudley was actually never exposed to conviction for any "codeine" offense in either Penalty Group 1 or Penalty Group 3.

6. Nor are we on "safe footing" by making any sort of favorable comparison between Penalty Group 4 "codeine," as specifically defined, with Penalty Group 3 "codeine," which includes codeine "or any of their salts: [in a particular grams per milliliter concentration] or not more than 90 grams per dosage unit, with one or more active, nonnarcotic ingredients in recognized therapeutic amounts[.]" Both penalty group descriptions contain words of art from the scientific community that do not, at least on their face, appear to have identical meanings. Nor is it a simple matter to say that proof of codeine combined with another nonnarcotic active medicinal ingredient, such as Promethazine, but without an analysis done for specific concentration amounts automatically places the codeine in Penalty Group 1 with its alternative description of "Codeine not listed in Penalty Group 3 or 4[.]" Thankfully, these issues are not before us in the instant appeal.

medicinal ingredient also proven. Dudley's first issue is overruled.[7]

Dudley's second issue contends that the trial court erred in overruling his objection to the jury charge as given. Dudley was convicted under section 481.118(a) of the Texas Health and Safety Code, which states, in pertinent part, as follows:

> [A] person commits an offense if the person knowingly or intentionally possesses a controlled substance listed in Penalty Group 4, *unless the person obtained the substance directly from or under a valid prescription or order of a practitioner acting in the course of practice.*

TEX. HEALTH & SAFETY CODE § 481.118(a) (Vernon Supp.2001) (emphasis added).

In addition, section 481.062(a)(3) of the Health and Safety Code states that someone may possess a controlled substance if that person is "an ultimate user or a person in possession of the controlled substance under a lawful order of a practitioner...." TEX. HEALTH & SAFETY CODE § 481.062(a)(3) (Vernon Supp.2001). At trial, the defense objected to the application portion of the court's charge because it did not require the jury to find that Dudley lacked a valid prescription for the codeine. The objection was overruled. Now Dudley contends that this omission mandates reversal. We disagree. Section 481.184(a) of the Health and Safety Code states that:

> The State is not required to negate an exemption or exception provided by this chapter in a complaint, information, indictment, or other pleading or in any trial, hearing, or other proceeding under this chapter. *A person claiming the benefit of an exemption or exception has the burden of going forward with the evidence with respect to the exemption or exception.*

TEX. HEALTH & SAFETY CODE ANN. § 481.184(a) (Vernon Supp.2001) (emphasis added).

■ Therefore, a person claiming the benefit of the "ultimate user" exemption or defense has the burden of producing evidence that raises the defense. *Wright v. State*, 981 S.W.2d 197, 200 (Tex.Crim.App. 1998). "Once the defense is raised, the trial court must, if requested, instruct the jury that a reasonable doubt on the issue requires that the defendant be acquitted." *Id.* A review of the trial record shows that Dudley offered no evidence that he possessed the codeine by prescription. In fact, one of the arresting officers was asked whether he had found a prescription for codeine in the car. He replied that he had not. But he did indicate that he found a baby food jar with cough syrup residue in the car, which in his experience was consistent with illicit, street level abuse of codeine. Since Dudley presented no evidence that he acquired the codeine by valid prescription, he was not entitled to a jury instruction on the "ultimate user" exemption. Dudley's second issue is overruled.

Appellant's conviction and sentence are affirmed.

AFFIRMED.

DAVID B. GAULTNEY, Justice, concurring.

I concur. Appellant does not contest the State's proof that he possessed a controlled substance, including adulterants or dilutants, with an aggregate weight of "200

---

7. For an interesting discussion encompassing the concepts of "adulterants and dilutants," the "entity theory," and chemical "precursors," as involving *weight* or *amount* of controlled substance present affecting legal sufficiency of the evidence, *see Dowling v. State,* 885 S.W.2d 103 (Tex.Crim.App.1992) ("original" opinion & opinion on rehearing).

grams or more but less than 400 grams." *See* TEX. HEALTH & SAFETY CODE ANN. § 481.118 (Vernon Supp.2001). The controlled substance's aggregate weight puts it squarely within the second degree felony range of section 481.118(d). Appellant does not contest the sufficiency of the State's proof that he possessed a "compound, mixture, or preparation" containing codeine and "one or more nonnarcotic active medicinal ingredients in sufficient portion to confer on the ... mixture ... valuable medicinal qualities other than those possessed by the narcotic drug alone[.]" *See* TEX. HEALTH & SAFETY CODE ANN. § 481.105(1) (Vernon Supp.2001). Rather, his point is that the concentration he possessed may have exceeded Penalty Group 4's concentration requirement, and instead placed his offense in Penalty Group 1 or 3. He does not contend that the concentration would have resulted in a milder punishment, such as by making his conduct a misdemeanor rather than a felony; the punishment classifications listed in section 481.118 are based upon the weight of the controlled substance possessed, and he does not contest the aggregate weight of the controlled substance he possessed. He makes the following argument in his brief.

> Without testimony regarding the concentration, any possible ratio of mixture could be inferred. To do so would not be to prove the codeine was listed in Penalty Group 4. It is also listed in Penalty Group 1 and Penalty Group 3.

In effect, appellant maintains the State had to show the actual level of codeine concentration in order to establish that the substance he possessed fell within Penalty Group 4 rather than a penalty group that requires a higher codeine concentration with resulting greater punishment. Bottom line, his point on appeal is that he may have been guilty of a greater offense than that for which he was convicted.

Because I believe the evidence was sufficient as to his guilt of possession of codeine in at least the concentration for which he was convicted, I concur in the affirmance of his conviction and sentence.

DON BURGESS, Justice, dissenting. ·

I respectfully dissent to the disposition of point of error one. While this is an important case, it is a relatively simple one. Dudley attacks the legal sufficiency of the evidence concerning the concentration of the codeine possessed.

Dudley was originally indicted for possession of penalty group 1 codeine, but the State amended the indictment to allege possession of penalty group 4 codeine. The application paragraph of the jury charge instructed the jury to consider if Dudley "possessed a controlled substance listed in Penalty Group 4 of the Texas Controlled Substance Act, namely, codeine...." The failure to allege in the indictment the amount involved or penalty group so as to reflect what punishment is involved, whether the offense is a misdemeanor or felony, or whether a District Court has jurisdiction renders an indictment fatally defective. Consequently, the State was required to plead within which penalty group the substance fell and then prove it fell within the definition of penalty group 4. *Benoit v. State*, 561 S.W.2d 810, 815 (Tex.Crim.App.1977); *see also Kolbert v. State*, 590 S.W.2d 711, 712 (Tex.Crim. App.1979). Thus, the question-did the State prove it? The State concedes the only proof is the testimony from a chemist that the substance taken from Dudley was "a combination commonly found in cough syrup type preparations that contain codeine in a concentration of less than 200 milligrams per milliliters of syrup," plus her testimony that codeine is listed in penalty group 4. The State also concedes the

chemist did not measure the concentration of the codeine. The State and the majority contend this expert opinion evidence is sufficient. I disagree.

The necessity to prove by chemical analysis that a material is illegal contraband clearly is an essential element of the State's case. *Aguilar v. State*, 850 S.W.2d 640, 642 (Tex.App.—San Antonio 1993), *rev'd on other grounds*, 887 S.W.2d 27 (Tex.Crim.App.1994); *see also Curtis v. State*, 548 S.W.2d 57, 59 (Tex.Crim.App. 1977) (although an experienced narcotics officer may identify marihuana, he may not testify that a powdered substance is heroin).

An expert's opinion may be based upon sufficient relevant facts, but those facts must be either within his personal knowledge, or assumed from common or judicial knowledge, or established by evidence. *Nejnaoui v. State*, 44 S.W.3d 111, 118 (Tex.App.—Houston [14th Dist.] 2001, pet. filed). Our Court of Criminal Appeals has spoken several times recently on expert testimony and its value as evidence. In *Jordan v. State*, 928 S.W.2d 550, 554–55 (Tex.Crim.App.1996)(footnote omitted), the court stated:

> While Rule 702 involves the dual inquiry of relevance and reliability, the Supreme Court emphasized that the "overarching subject" of Rule 702 is the scientific validity of the evidence at issue. [*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–95, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469]. In sorting the untested or invalid theories from those that are grounded in "good" science, trial judges are called upon to serve as "gatekeepers." *Id.* 509 U.S. at 595–99, 113 S.Ct. at 2798–99. With respect to the relevance consideration, the Court pointed to Rule 702's requirement that the expert's testimony "assist the trier of fact to understand the evidence

or to determine a fact in issue." *Id.* 509 U.S. at 589–93, 113 S.Ct. at 2795–96. Expert testimony that does not relate to a fact in issue is not helpful. This consideration is what the Supreme Court referred to as the "fit" requirement. That is, the proffered testimony must be " 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Id.* 509 U.S. at 591–93, 113 S.Ct. at 2796 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir.1985)).

In line with this Court and the United States Supreme Court, the Texas Supreme Court recently held that under Texas Rule of Civil Evidence 702, the proponent of expert testimony must show that it is relevant to the issues in the case and is based on a reliable scientific foundation. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (1995). The Court emphasized the role of trial courts in scrutinizing "proffered evidence for its scientific reliability when it is based upon novel scientific theories, sometimes referred to as 'junk science.' " *Id.* at 554.

The focus of the courts in *Kelly* [*v. State*, 824 S.W.2d 568], *Daubert*, and *Robinson*, was on assessing the scientific reliability of the evidence at issue, rather than its relevance. As discussed at length in those cases, reliability depends upon whether the evidence has its basis in sound scientific methodology. This demands a certain technical showing. Accordingly, it is upon the reliability inquiry that trial courts can weed out testimony pertaining to so-called "junk science." *Id.* It is largely to this end that trial judges are called upon to serve as "gatekeepers." *Daubert*, supra. While "junk science" or otherwise inadequately tested scientific theories might be shown to relate to the facts of a case and to that extent be of assistance to the jury,

it will not have a sufficiently sound scientific basis to be reliable.

928 S.W.2d at 554–55.

Later in *Hartman v. State*, 946 S.W.2d 60, 62–63 (Tex.Crim.App.1997)(footnote omitted), the court said:

Nowhere in *Kelly* did we limit the two-pronged standard to novel scientific evidence. The Supreme Court in *Daubert* directly addressed the issue in a footnote, stating "[a]lthough the *Frye* decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specifically or exclusively to unconventional evidence." *Daubert*, 509 U.S. at 593 n. 11, 113 S.Ct. at 2796 n. 11. The Supreme Court noted that "under the Rules, the trial judge must ensure that *any and all scientific testimony* or evidence admitted is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. at 2795 (emphasis added). We likewise see no value in having a different standard of admissibility for novel scientific evidence. The problems presented in determining whether or not a particular type of evidence would be considered "novel" are daunting enough to reject application of a dual standard. Moreover, we observe that the factors and criteria set forth in *Kelly* as bearing upon the reliability of proffered scientific evidence are adequate measure for assuring that "novel" scientific evidence which is "junk science" is excluded.

These factors "address the soundness of the underlying scientific theory and technique." *Jordan v. State*, 928 S.W.2d 550, 554 (Tex.Crim.App.1996). This is the linchpin of Rule 702:

[R]eliability depends upon whether the evidence has its basis in sound scientific methodology. This demands a certain technical showing. Accordingly, it is upon the reliability inquiry that trial courts can weed out testimony pertaining to so-called "junk science." *Id.* It is largely to this end that trial judges are called upon to serve as "gatekeepers." *Daubert*, supra. While "junk science" or otherwise inadequately tested scientific theories might be shown to relate to the facts of a case and to that extent be of assistance to the jury, it will not have a sufficiently sound scientific basis to be reliable.

*Id.* at 555.

The standard adopted by this Court in *Kelly* applies to all scientific evidence offered under Rule 702. The court of appeals erred in applying a standard different than that set forth in *Kelly*.

. . .

946 S.W.2d at 62–63.

The Courts have been consistent; there must be facts underlying the expert's opinion or it is "no evidence." Simply because an expert says it . . . "don't make it so!"[8] It was, in my view, necessary for the chemist to actually test the substance for

**8.** Consider this language from *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 712–13 (Tex.1997)(footnote omitted):

Justice Gonzalez, in writing for the Court, gave rather colorful examples of unreliable scientific evidence in *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995), when he said that even an expert with a degree should not be able to testify that the world is flat, that the moon is made of green cheese, or that the Earth is the center of the solar system. If for some reason such testimony were admitted in a trial without objection, would a reviewing court be obliged to accept it as some evidence? The answer is no. In concluding that this testimony is scientifically unreliable and therefore no evidence, however, a court necessarily looks beyond what the expert said. Reliability is determined by looking at numerous factors including those set forth in *Robinson* and *Daubert*. The testimony of an expert is generally *opinion* testimony. Whether it rises to the level of

its concentration. Since she admitted she did not do so, her opinion concerning the concentration equals "no evidence." Therefore, the state did not prove the codeine possessed by Dudley was penalty group 4 codeine and failed to prove an essential element of the indictment. Consequently, the evidence is legally insufficient and this court should reverse and acquit. *Gollihar v.. State,* 46 S.W.3d 243, 245 (Tex.Crim.App.2001) (citing *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).

*evidence* is determined under our rules of evidence, including Rule 702, which requires courts to determine if the opinion testimony will assist the jury in deciding a fact issue. While Rule 702 deals with the admissibility of evidence, it offers substantive guidelines in determining if the expert testimony is some evidence of probative value.

Similarly, to say that the expert's testimony is some evidence under our standard of review simply because the expert testified that the underlying technique or methodology supporting his or her opinion is generally accepted by the scientific community is putting the cart before the horse. As we said in *Robinson,* an expert's bald assur-

ance of validity is not enough. 923 S.W.2d at 559 (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1316 (9th Cir., 1995) (on remand) (holding that expert's assertion of validity is not enough; there must be objective, independent validation of the expert's methodology), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995)).

The view that courts should not look beyond an averment by the expert that the data underlying his or her opinion are the type of data on which experts reasonably rely has likewise been rejected by other courts. The underlying data should be independently evaluated in determining if the opinion itself is reliable....