**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00165-CR**
_____

**DERWIN DEWAYNE BELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 19th District Court
McLennan County, Texas
Trial Cause No. 2021-1602-C1

**MEMORANDUM OPINION**

Derwin Dewayne Bell was indicted for three counts of possession of a controlled substance with intent to distribute. Tex. Health & Safety Code Ann. § 481.112.[1] Count I alleged possession of four grams or more but less than 200 grams of methamphetamine. Count II alleged possession of four or more grams but less

[1]This case was transferred from the Tenth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* Tex. Gov't Code Ann. § 73.001.

1

than 200 grams of heroin. Count III alleged possession of four grams or more but less than 200 grams of cocaine. The State later waived a fourth count and proceeded on a lesser offense as to Count II by reducing the amount of cocaine alleged to have been possessed to one gram or more but less than four grams. A jury found Bell guilty on all three counts. On Count I, the jury sentenced Bell to seventy years in prison. On Count II, the jury sentenced Bell to sixty years in prison. On Count III, the jury sentenced Bell to seventy years in prison. The trial court ordered the sentence on Count I to run consecutively to Bell's conviction in Cause No. 2021-1275-C1.[2]

In two issues, Bell complains that the evidence is legally insufficient to support his conviction and that the trial court erred in the jury charge by not requiring the State to prove Bell was not "registered with or exempt from registration with the Federal Drug Enforcement Administration[.]" For the reasons discussed below, we conclude that the evidence is legally sufficient and that the jury charge was not erroneous, and we affirm the trial court's judgment.

## Background

A grand jury indicted Bell for possession of a controlled substance with intent to deliver. Count I of the indictment alleged that

---

[2]Bell appeals his conviction in trial cause number 2021-1275-C1. We issued an opinion in that cause number under Appellate Cause No. 09-24-00164-CR.

**DERWIN DEWAYNE BELL**, hereinafter called Defendant, on or about the 9th day of June, 2021, in said county and state did then and there knowingly possess, with intent to deliver, a controlled substance, namely methamphetamine, in an amount of four grams or more but less than 200 grams[.]

Count II of the indictment alleged that

**DERWIN DEWAYNE BELL**, in the County of McLennan and State aforesaid on or about the 9th day of June, 2021, did then and there knowingly possess, with intent to deliver, a controlled substance, namely heroin, in an amount of 1 gram or more but less than 4 grams[.]

Count III of the indictment alleged that

**DERWIN DEWAYNE BELL**, in the County of McLennan and State aforesaid on or about the 9th day of June, 2021, did then and there knowingly possess, with intent to deliver, a controlled substance, namely cocaine, in an amount of four grams or more but less than 200 grams[.]

Several witnesses testified at trial. We discuss their testimony below.

*David Allison*

David Allison is an officer with the Street Crimes Unit with the Waco Police Department. The Street Crimes Unit deals with street-level narcotics interdicts, wanted fugitive apprehension, and quality-of-life issues. On June 9, 2021, Allison was called to a traffic stop conducted by the U.S. Marshals Service where they had two individuals in custody. Allison searched Bell and placed him in the back of his patrol car. When he searched Bell, he found approximately $1,700 in currency in Bell's front left and front right pockets, which "raised some questions[]" according to Allison.

3

Allison assisted in processing the vehicle which was stopped by the U.S. Marshals. Multiple narcotics were found in the vehicle, and pictures of the narcotics were admitted at trial. A backpack containing marijuana and three prescription bottles in Bell's name were found. A clear plastic bag containing multiple different colored pills was found in a diaper bag. A smaller dinosaur-print bag inside the diaper bag contained multiple packages of suspected narcotics. The dinosaur-print bag matched another bag found at the residence located at 3017 Fadal that law enforcement searched later that day. A red transparent bag containing a white-like substance suspected to be methamphetamine was also found in the vehicle. Law enforcement also found a clear plastic bag with a brown or dark-like tar substance, which Allison believed was tar heroin. These items were found in the backseat of the vehicle. Another transparent bag with small, multicolored pills, which Allison believed to be ecstasy, was also found in the backseat. Allison also found multiple plastic bags that were twisted around inside the dinosaur-print bag that included various pills. Allison testified that when he saw the bags of pills in this particular format, he believed that these pills "would probably be for sale, just due to the amount."

A bag in the trunk contained multicolored pills with suspected ecstasy, a transparent clear plastic bag that contained marijuana and another bag of pills. Allison field tested the bag that came out of the trunk and the field test showed a

4

presence for methamphetamine. The State admitted a picture of the dinosaur-print bag with the contents that were found inside the bag. The contents showed tar heroin, crystal meth, methamphetamine or ecstasy, and other pills.

Allison testified about the physical evidence collected from the vehicle. State's Exhibit 12 is a backpack, which contained two large vacuum-sealed bags of marijuana, two digital scales, and packaging materials, namely sandwich bags. Allison explained that the vacuumed-sealed bags indicate large quantities of marijuana are sealed together for distribution. The scales are a way to weigh the narcotics before dealers sell them. Allison testified that the digital scales and the storage bags are common with people who sell drugs. State's Exhibit 14 showed pills with markings wrapped in individual bags. Allison suspected the pills to be acetaminophen with hydrocodone, which is a controlled substance that an individual cannot have without a prescription. State's Exhibit 15 showed Xanax, or alprazolam. He explained that the pills were Xanax due to the shape and multiple score marks on them, which indicates the dosage. Allison testified that alprazolam is a controlled substance which requires an individual to have a prescription. He did not see a prescription in the vehicle for alprazolam or hydrocodone. State's Exhibit 16 showed another bag of round pills, but Allison could not identify what the pills were.

Allison identified State's Exhibit 17 as suspected Adderall, which is a controlled substance. Allison believed that Adderall is amphetamine based. Allison

did not find any type of prescription for Adderall. The pills were packaged in sandwich baggies, separated from everything else. Allison also identified the black tar heroin, the suspected methamphetamine, and suspected ecstasy pills. Allison found the suspected ecstasy tablets in the diaper bag. There was also a dinosaur-print bag that had a "kid print" design on it that was found with drugs in it.

State's Exhibit 22 was another bag of marijuana, with individual bags of marijuana packaged for sale. State's Exhibit 23 was a Ziploc bag containing a plastic bag with white, oval tablets. Allison testified that these pills, which he believed to be acetaminophen with hydrocodone, were found in the trunk.[3] These pills were in a baggie that looked ready for sale. The pills that were found in the trunk were consistent with what was found in the interior of the vehicle. State's Exhibit 25 were suspected Adderall pills in a knotted bag. State's Exhibit 26 is a prescription bottle for Oxycodone with the name "Vendetta Wilcox" on the bottle. State's Exhibit 27 is a suspected bag of ecstasy. Law enforcement performed a field test on these drugs, which showed a positive result for the presence of methamphetamine.

Allison testified that based on his experience in Street Crimes, the amount of the drugs suggests that Bell could possibly be dealing narcotics. Allison acknowledged that there were other individuals in the vehicle and that "Everybody is in care, custody, and control of [the drugs]."

---

[3]Although the record used the term "Ziplock," the proper term is "Ziploc."

On cross-examination, Allison admitted that he was not present when the vehicle was originally stopped by law enforcement. Allison knew that Bell had multiple warrants through the Waco Police Department and "assumed that's why the vehicle was stopped." Another individual, Mr. Bonner, was one of the other occupants in the vehicle and was arrested as well. Allison did not know if either Bonner or Bell was the driver of the vehicle. Allison did not find any drugs on Bell when he searched him. The diaper bag and the backpack were both found in the backseat of the car, but Allison was "not entirely sure[]" where Bell was sitting in the car. Law enforcement found the items that were taken from the car in the backseat and the trunk of the vehicle, although a majority of the items were found in the backseat.

*Johnathan Estes*

Special Agent Johnathan Estes is assigned to the Texas Anti-Gang Center with the Texas Department of Public Safety. Estes was familiar with the address of 3017 Fadal because it is "known to be a hangout and a distribution house, stash house, for numerous individuals that are in the Rockout street gang." On June 9, 2021, the U.S. Marshals, DPS, and McClennan County Sheriff's Department were conducting a surveillance operation at that address. Law enforcement had information that Bell was going to be at that residence and hangs out at that residence. Law enforcement

7

observed Bell arrive in a vehicle, go inside the residence, and then come out of the residence.

Bell did not enter the residence with anything, but he came out with a black backpack. When he exited the residence, he got in the back passenger seat of the vehicle that he arrived in. There were three other individuals in that car, including one child. After the U.S. Marshals made contact with the vehicle, law enforcement saw narcotics "in plain view[]" in the vehicle and subsequently searched the vehicle based upon the arrest and probable cause.

Based upon the totality of the circumstances, the backpack, and the number of narcotics in the vehicle, Estes obtained a search warrant for the 3017 Fadal address. Estes assisted in the search of the residence. Estes sponsored State's Exhibits 28-67, which were mostly photos taken during the search of the 3017 Fadal residence. Exhibit 28 showed the front of the house and Exhibit 29 was a picture from Facebook dated June 13, 2020, which showed Bell at the 3017 Fadal address. Estes testified that the Facebook picture led him to believe that Bell was familiar with this address for at least a year before the search occurred on June 9, 2021. During the search, officers found drugs and firearms in the residence.

In the garage, officers noticed marijuana on a couch. Additionally, there was a hole in the attic space. At the top of the attic space, officers found five firearms, multiple drugs, and bullets. There was an extensive amount of drugs in bedroom

two. Estates testified that Barbara Haynes rents the house. Haynes said that Omarion Haynes and Demondre Mays also stayed in the house. Omarion Haynes is Barbara Haynes' grandson. Law enforcement also knew that Bell stayed at the residence. Bedroom one is Barabra Haynes's bedroom. No drugs were found in bedroom one. The only areas where drugs were found were in the garage, in the attic, and in bedroom two.

In the attic, law enforcement found a backpack containing marijuana and another backpack with a short-barreled firearm and marijuana next to it. Several shell casings or bullets were found throughout the house, including the attic, the garage, and in bedroom two. State's Exhibit 39 was a picture of a bag of multiple different drugs, including cocaine, ecstasy, and marijuana.

State's Exhibits 68-96 were primarily photos of physical evidence seized in the search, including guns, bullets, drugs, magazines, Ziploc bags with residue, and a t-shirt and two hoodies with gang logos. Estes explained that a group that is selling drugs needs a large amount of firearms because there is "a lot of gang violence. They have to worry about getting ripped . . . [.] [T]hey go out and shoot people also, you know." If someone "gives a bad rap to the gang or, . . . talks, especially on social media[,]" Estes explained that the gang will "rap about it, talk about it on social media, and then they're going to go get revenge." The drugs and guns were found within arm's reach of the attic access.

9

The amount of product found indicated mid-level drug dealing. The amount of marijuana found was such that it could be smelled as one approached the house. There were Xanax and hydrocodone pills packaged for sale. Additionally, multiple Adderall pills in distribution amounts were found. A large quantity of cocaine was found, which appeared to have been broken off from a larger parcel. Along with these items, law enforcement recovered approximately $6,200 in cash found in the attic.

Law enforcement also found drugs in bedroom two. Estes described the surveillance system in the house. There were surveillance cameras on a big television in the middle of the bedroom where individuals watch to see if anyone is coming to the house. Estes explained that if someone is "coming to rip them," they can "see them first so they can pretty much defend themselves." There was no DVR attached for recording.

Hanging on a wall of the bedroom was a shirt with a logo of a gun and the words "Rockout Bidness," which Estes characterized as gang paraphernalia. Estes testified that Bell is a confirmed and documented member of the Rockout street gang. Bell, in fact, was one of the founding members. As a founding member, Bell is "one of the people that makes decisions in the gang. He can buy drugs, spend money. . . [.] [H]e's one of the shot callers of the gang." Omarion Haynes was also a member of the Rockout gang and went by the name "Little Rock Out." Estes

10

characterized the house as both a "stash house" and a "hangout house" for members of the Rockout gang, where Bell would have full control and access to anything in the house.

Officers found a bag in the house with the identical dinosaur-print design that was found in the diaper bag in the vehicle. Estes explained that there were consistencies between the drugs found in the car and the drugs found in the house, including the actual drugs and the packaging. There also was a heat-sealed bag of marijuana, which indicates that someone is selling multiple pounds of marijuana, on the couch in bedroom two. The heat-sealed bags mask the smell of the marijuana. Officers found a drum that goes into a .223 AR-15 type of semiautomatic rifle. Scales were also found, which indicates that the Fadal house was used as a stash house and a packaging house. Estes further surmised that the gang could be moving drugs from place to place in order to process and package the drugs. The weapons found would be used by the gang to protect the product.

Estes compared State's Exhibit 29 (the Facebook photo) with State's Exhibit 60, which showed a shoe with red, orange, and green inside that was found in the bedroom. He noted that Bell and his associate were wearing the same shoes in the Facebook photo that were found in the Fadal residence.

An Amazon package was found in the bedroom, addressed to "Rockout" at 3017 Fadal. Estes explained that the gang is getting mail at the Fadal address and

11

that Bell, as one of the leaders of the gang, would likely be the intended recipient of that package. Articles of clothing with the "Rockout Bidness" logos, indicating gang membership identity, were found in the bedroom. A Burberry receipt bearing Bell's name and dated December 18, 2020 was also found in the bedroom. An envelope from a prison unit in Tennessee Colony addressed to "D. Bell" at the Fadal residence was found, showing that Bell was receiving mail at the residence. Moreover, Bell's TDCJ offender card that he was issued while in prison was found in bedroom two.

The search of the house lasted three or four hours, and Estes explained that as officers kept finding more drugs, they remarked "This is kind of getting ridiculous. There's so much." Because it was such a large seizure, not all of the drugs were field tested; they were sent to a lab that decides what is tested.

On cross-examination, Estes agreed that Bell was not the driver or owner of the vehicle that was stopped. Estes testified that Bell was sitting in the back passenger seat of the vehicle. He did not know how many people regularly used the Fadal house. Estes explained that no fingerprint testing was done on the weapons because "it was so hot in there that we were covered in sweat, and those guns were wet from all of our sweat."

*Lindsay Ornelas*

Lindsay Ornelas is a forensic scientist with the Texas Department of Public Safety in Waco. Ornelas sponsored her lab reports, which were admitted as State's

Exhibits 100-103. Ornelas explained that DPS doesn't test everything the lab receives. Their policy is to test the highest penalty for the evidence that is submitted, and then additional analysis may be requested. DPS typically tries to find the item with the highest weight, and that is the item they will test. The lab will test the item to jurisdictional limits based on the Health and Safety Code.

Ornelas explained the process and methods used to test the first item, which was a white crystalline substance. State's Exhibit 100 was a seized drugs analysis laboratory report that tested a Ziploc bag containing a red Ziploc bag with a white crystalline substance. The item weighed 7.49 grams, plus or minus 0.06 grams. The test confirmed that this substance contained methamphetamine.

Ornelas next explained the tests she performed on the suspected ecstasy tablets. Ornelas also explained the statistical sampling plan used in testing the items. Ornelas tested five of the items in that piece of submitted evidence, and they all came back with eutylone and methamphetamine. The common name for eutylone is bath salts. State's Exhibit 101 was a seized drugs analysis laboratory report that tested a Ziploc bag containing a blue Ziploc bag with various colored and shaped tablets. The total weight of all forty-six tablets is 9.42 grams, plus or minus 0.06 grams. The results show that the items contain methamphetamine.

Ornelas tested State's Exhibit 18, which was a Ziploc bag containing a plastic bag with a black substance. The item weighed 2.57 grams, plus or minus 0.06 grams.

13

The item contains codeine, heroin, monoacetylmorphine, and morphine. Ornelas explained that all of these substances fall in the class of opiates. The results of her analysis were admitted as State's Exhibit 102.

State's Exhibit 103 is a seized drugs analysis laboratory report that contained the results of several items that Ornelas tested. The first item that was tested in this report was a plastic bag containing 545 orange, round tablets, which was State's Exhibit 77. The item weighed 139.79 grams, plus or minus 0.06 grams. Out of the five tablets Ornelas tested, they contained methamphetamine. Ornelas randomly sampled the pills when she tested them. Ornelas also tested a red Ziploc bag containing orange, round tablets. That item weighed 215.62 grams, plus or minus, 0.06 grams. Ornelas tested five of the 839 tablets in this bag. The tablets contained methamphetamine.

Ornelas also tested State's Exhibit 93, which was a Ziploc bag containing a red Ziploc bag with orange, round tablets. There were 832 tablets in this bag and Ornelas tested five of the tablets. The weight of this bag was 213.37 grams, plus or minus 0.06 grams. The tablets contained methamphetamine.

Ornelas tested State's Exhibit 79, which is a Ziploc bag containing three plastic bags with a white powder substance. Ornelas tested each bag individually and got three results. All the bags contained cocaine. The weight was 84.24 grams, plus or minus 0.09 grams.

14

Neither side objected to the jury charge. In relevant part, the jury charge included the following instructions:

> Our law provides that a person commits an offense if he knowingly possesses with intent to deliver a controlled substance. Methamphetamine, Heroin, and Cocaine are controlled substances.
>
> "Delivery" means the actual or constructive transfer from one person to another of a controlled substance, whether or not there is an agency relationship.
>
> "Constructive transfer" is the transfer of a controlled substance either belonging to an individual or under his direct or indirect control, by some other person or manner at the instance or direction of the individual accused of such constructive transfer. It also includes an offer to sell a controlled substance. Proof of an offer to sell must be corroborated by a person other than the offeree or by evidence other than a statement of the offense.
>
> "Possession" means actual care, custody, control or management. Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control.
>
> . . . .
>
> A person acts intentionally, or with intent, with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct.
>
> A person acts knowingly, or with knowledge, with respect to the nature of his conduct when he is aware of the nature of his conduct.

The application portion of the charge provided:

> COUNT I
>
> As to the charge of Possession of a Controlled Substance with Intent to Deliver, to-wit: Methamphetamine, as alleged in Count I of the

15

indictment, you must decide whether the State has proved, beyond a reasonable doubt the listed elements. The elements are that:

1. The Defendant, Derwin DeWayne Bell;
2. On or about the 9th day of June, 2021;
3. In McLennan County, Texas;
4. Knowingly possess, with intent to deliver, a controlled substance;
5. Namely, Methamphetamine;
6. In an amount of four grams or more but less than 200 grams.

You must all agree on the elements listed above.

If you all agree the State has proved each of the elements listed above, you must find the Defendant "guilty" of Possession of a Controlled Substance with Intent to Deliver, to-wit: Methamphetamine, as alleged in Count I of the indictment.

The application sections for Counts II and III used language essentially identical to Count I, tailored to the specific substances and the specific jurisdictional weights.

The jury returned guilty verdicts on all three counts. Bell was sentenced to seventy years on Count I, sixty years on Count II, and seventy years on Count III. Bell appeals his convictions.

In two issues, Bell complains that the evidence is legally insufficient to support his convictions and that the trial court erred in the jury charge by not requiring the jury to find all the required elements. Bell argues the evidence is legally insufficient to support the verdict for four reasons. First, he complains that the evidence did not establish the penalty group as required by Texas Health and Safety

16

Code section 481.112(a). Second, that the evidence did not establish Bell "possessed" the controlled substances. Third, that the evidence did not establish Bell violated Texas Health and Safety Code section 481.061(a). And fourth, that the evidence did not establish that the exemptions set forth in Texas Health and Safety Code section 481.061(a) do not apply to him.

Sufficiency of the Evidence

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id*. Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. We do not assess the credibility of

17

the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761-62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

In his first issue, Bell complains that the evidence was insufficient as to all counts because the evidence did not establish the penalty group pursuant to Texas Health and Safety Code section 481.112 which provides, "Except as authorized by this chapter, a person commits an offense if the person knowingly manufactures, delivers, or possesses with intent to deliver a controlled substance listed in Penalty Group 1." Tex. Health & Safety Code Ann. § 481.112(a). The Texas Controlled Substances Act defines "controlled substance" as including a substance listed in Penalty Group 1. *Id*. § 481.002(5). Section 481.102 lists the substances that are

18

considered Penalty Group 1, and these include substances Bell was charged with possessing: heroin, cocaine, and methamphetamine. *Id.* § 481.102(2), (3)(D), (6).

Whether a substance is a controlled substance is a question of law, not of fact. *Cleveland v. State*, No. 05-19-00515-CR, 2020 Tex. App. LEXIS 3622, at *2 (Tex. App.—Dallas Apr. 29, 2020, no pet.) (mem. op., not designated for publication); *see also Clark v. State*, No. 06-25-00049-CR, 2026 Tex. App. LEXIS 1060, at *17 (Tex. App.—Texarkana Feb. 4, 2026, pet. filed) (mem. op., not designated for publication), *Plumlee v. State*, No. 02-17-00174-CR, 2018 Tex. App. LEXIS 4845, at *11 (Tex. App.—Fort Worth, June 28, 2018, pet. ref'd) (mem. op., not designated for publication), *Lindsay v. State*, No. 06-11-00242-CR, 2012 Tex. App. LEXIS 6249, at *4-5 (Tex. App.—Texarkana July 31, 2012, no pet.) (mem. op., not designated for publication).

Bell asks us to reject this approach and look to the plain language of the statute. However, the penalty group to which a substance belongs is a question of law determined by the Texas Legislature. *See Lindsay*, 2012 Tex. App. LEXIS 6249, at *4-5; *see also Black v. State*, 491 S.W.2d 428, 431 (Tex. Crim. App. 1973) *overruled on other grounds by Faulkner v. State*, 549 S.W.2d 1, 4 (Tex. Crim. App. 1976) ("The question as to whether marihuana is a narcotic drug is one of law and not of fact."). Thus, heroin, cocaine, and methamphetamine are, by definition and as

19

a matter of law, controlled substances that fall within Penalty Group 1. We overrule Bell's first sub-issue.

In his second sub-issue, Bell complains that the evidence failed to show that Bell possessed the controlled substances. Specifically, Bell points out that the police only saw narcotics in plain view; there were four people in the car, one an infant, where the drugs were found; the evidence established that Bell had a backpack containing marijuana but not that he possessed the diaper bag or other drugs found in the trunk; the diaper bag contained prescription bottles with Bell's name on them but the prescription bottles cannot establish possession because prescription medication is often stolen.

"To prove unlawful possession of a controlled substance, the State must first prove appellant exercised actual care, control and management over the contraband and second, that appellant had knowledge the substance in his possession was contraband." *Nixon v. State*, 928 S.W.2d 212, 215 (Tex. App.—Beaumont 1996, no pet.) (citing *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995)). The State need not prove exclusive possession of the contraband, since control over contraband may be jointly exercised by more than one person. *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985); *State v. Derrow*, 981 S.W.2d 776, 779 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd). However, "mere presence at a place where contraband is being used or possessed by others does not justify finding that

20

a person is in joint possession or is a party to an offense." *Roberson v. State*, 80 S.W.3d 730, 735 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd).

When an accused is not in exclusive possession of the location where contraband is found, additional independent facts and circumstances may affirmatively link him to the contraband. *Nixon*, 928 S.W.2d at 215. An affirmative link may be established through either direct or circumstantial evidence, and it must show that the accused's connection to the contraband was more than fortuitous. *Poindexter v. State*, 153 S.W.3d 402, 405-06 (Tex. Crim. App. 2005). Factors which tend to establish affirmative links include:

(1) the contraband was in plain view;

(2) the accused was the owner of the premises in which the contraband was found;

(3) the contraband was conveniently accessible to the accused;

(4) the contraband was found in close proximity to the accused;

(5) a strong residual odor of the contraband was present;

(6) paraphernalia to use the contraband was in view or found near the accused;

(7) the physical condition of the accused indicated recent consumption of the contraband in question;

(8) conduct by the accused indicated a consciousness of guilt;

(9) the accused had a special connection to the contraband;

(10) the place where the contraband was found was enclosed;

(11) the occupants of the premises gave conflicting statements about relevant matters; and

(12) affirmative statements connect the accused to the contraband.

*Nixon*, 928 S.W.2d at 215. "It is . . . not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial." *Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006).

In this case, the evidence established many affirmative links between Bell and the controlled substances. Law enforcement stopped Bell during a traffic stop and during a search found approximately $1,700 in U.S. currency in Bell's pockets. Officers found drugs in plain view in the vehicle Bell was riding in. A backpack was found in the backseat of the vehicle, and Estes testified that Bell was a backseat passenger. There were three pill bottles with Bell's name on them that were found in the backpack. Additionally, Bell was in possession of marijuana at the time of the traffic stop and several other controlled substances which were packaged for sale were found in the trunk of the vehicle. A dinosaur-print bag was found in the vehicle as well as at the Fadal street residence. Photographs admitted at trial showed that Bell posted an image of himself on social media posing in front of this house a year earlier. Moreover, Bell received mail at the Fadal residence and his TDCJ offender identification card was found there, too.

22

Estes testified that the Fadal house was the hangout and stash house for the Rockout criminal street gang, of which Bell was a founding member. He posed for photographs wearing gang clothing specific to the Rockout gang, and Rockout hoodies and t-shirts were found during the search of the residence. Estes testified that law enforcement surveillance observed Bell come to the Rockout house empty-handed but with a black backpack before the traffic stop. The evidence at trial linked Bell to the stash house and drugs on Fadal.

The search of the Fadal house revealed a "ridiculous" amount of drugs, including ecstasy, Adderall, Xanax, methamphetamine, and marijuana. Several appurtenances of drug dealing were also found, including scales, firearms, magazines, drums, ammunition, and packaging materials. Another $6,200 in U.S. currency was found at the Fadal residence. Monitors which streamed a live video feed of anyone approaching the house were also found in the search. The Fadal house had an overwhelming smell of marijuana. We conclude that sufficient affirmative links exist in this case. *See Nixon*, 928 S.W.2d at 215.

Next, Bell argues that the evidence is insufficient because it did not establish whether the exception in Health and Safety Code section 481.061(a) applied to him. And Bell argues that the evidence did not establish that the exceptions in Health and Safety Code section 481.062 did not apply to him. We address these arguments together. Health and Safety Code section 481.061(a) states: "Except as otherwise

23

provided by this chapter, a person who is not registered with or exempt from registration with the Federal Drug Enforcement Administration may not manufacture, distribute, prescribe, possess, analyze, or dispense a controlled substance in this state." Tex. Health & Safety Code Ann. § 481.061(a). Section 481.062 lists several persons that may possess a controlled substance under this chapter without registering with the Federal Drug Enforcement Administration. *Id.* § 481.062.

Under the Penal Code, a prosecuting attorney must negate the existence of an exception to an offense in the accusation charging commission of the offense and prove beyond a reasonable doubt that the defendant or defendant's conduct does not fall within the exception. Tex. Penal Code Ann. § 2.02(b). However, this requirement does not apply to offenses committed under the Texas Controlled Substances Act. Specifically, section 481.184 of the Health and Safety Code states in relevant part:

(a) The state is not required to negate an exemption or exception provided by this chapter in a complaint, information, indictment, or other pleading or in any trial, hearing, or other proceeding under this chapter. A person claiming the benefit of an exemption or exception has the burden of going forward with the evidence with respect to the exemption or exception.

(b) In the absence of proof that a person is the duly authorized holder of an appropriate registration or order form issued under this chapter, the person is presumed not to be the holder of the registration or form. The presumption is subject to rebuttal by a person charged with an offense under this chapter.

Tex. Health & Safety Code Ann. § 481.184(a), (b). The Controlled Substances Act explicitly removes the Penal Code's pleading requirement of negating any exemptions or exceptions in an indictment and places the burden of going forward with evidence with respect to such exemptions or exceptions upon the defendant. *Threlkeld v. State*, 558 S.W.2d 472, 473 (Tex. Crim. App. 1977) (rule requiring state to negate exception no longer applies to indictments alleging possession of controlled substance); *see also Brewster v. State*, 606 S.W.2d 325, 329 n.10 (Tex. Crim. App. 1980); *Johnson v. State*, 705 S.W.2d 154, 155-56 (Tex. App.— Texarkana 1985, no writ). Thus, the State was not required to prove that Bell was not registered or exempt from registration with the DEA or any of the other exceptions listed in section 481.062; instead, Bell, as the person attempting to claim the benefit of the exception, had the burden to produce evidence regarding the exemption. *See Rodriquez v. State*, 561 S.W.2d 4, 4-5 (Tex. Crim. App. [Panel Op.] 1978); *Threlkeld*, 558 S.W.2d at 473; *Dowden v. State*, 455 S.W.3d 252, 255 (Tex. App.—Fort Worth 2015, no pet.); *Dudley v. State*, 58 S.W.3d 296, 301 (Tex. App.— Beaumont 2001, no pet.); *Nowling v. State*, 801 S.W.2d 182, 185 (Tex. App.— Houston [14th Dist.] 1990, pet. ref'd). We overrule Bell's third and fourth sub-issues.

## Jury Charge

In Bell's second issue, he complains that the charge erroneously failed to require the jury to find that he was not registered or exempt from registration with the Federal Drug Enforcement Administration, and that the charge also erroneously omitted an instruction that in the absence of evidence the jury could presume that Bell did not have the required license but that the jury was free to reject that presumption.

The trial court is required to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14; *see also Mendez v. State*, 545 S.W.3d 548, 551-52 (Tex. Crim. App. 2018); *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995) (internal citations omitted). "Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Id*.

When reviewing alleged charge error, we determine whether error existed in the charge and, if so, whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). "Only if we find error do we then consider whether an objection to the charge was made and analyze for harm." *Tottenham v. State*, 285 S.W.3d 19, 30 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citations omitted).

As discussed in sub-issues three and four, the person claiming the benefit of an exemption or exception under Chapter 481 has the burden of producing evidence that raises the issue. *See* Tex. Health & Safety Code Ann. § 481.184(a). That a defendant is registered or exempt from registration with the DEA is a defensive issue upon which the defendant bears the burden to produce evidence, rather than an exception which the State must negate. *Id*.; s*ee Threlkeld*, 558 S.W.2d at 473. A trial court need not *sua sponte* instruct a jury on defensive issues, because an unrequested defensive issue is not the law "applicable to the case." *See Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998); Tex. Code Crim. Proc. Ann. art. 36.14. Instead, a defendant must timely request an instruction or object to its omission from the charge. *Id*. A review of the trial record shows Bell neither offered any evidence that he was registered or exempt from registration with the DEA, nor did he object or request any jury charge instruction regarding this defensive issue, including any instruction regarding any presumption under section 481.184(b). Therefore, the

27

Health and Safety Code's provisions regarding registration or exemption from registration with the DEA are not the law applicable to the case, and the trial court did not err in omitting instructions regarding those provisions from the charge. Bell's second issue is overruled.

## Conclusion

Having overruled Bell's two issues, we affirm the trial court's judgment.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on June 27, 2025
Opinion Delivered April 8, 2026
Do Not Publish

Before Johnson, Wright and Chambers, JJ.